UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# 23-20172-CR-WILLIAMS/REID

CASE NO. _____

18 U.S.C. § 371
18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 2
18 U.S.C. § 982(a)
28 U.S.C. § 2461(c)

FILED BY_____KAN_____D.C.

Apr 20, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

v.

MICHAEL KANE,
SHANE HAMPTON, and
GEORGE WOLVAARDT,

Defendants.

_____ ___ _____ /

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At various times relevant to this Indictment:

### The Defendants and Relevant Individuals, Entities, and Terms

1.      Defendant **MICHAEL KANE** was a resident of New York, New York, and Miami, Florida.

2.      **MICHAEL KANE** was the co-founder and CEO of the Hydrogen Technology Corporation ("Hydrogen Technology"). Hydrogen Technology was a privately-held Delaware corporation based in Miami, Florida, and was previously based in New, New York. Hydrogen

Technology's primary business between June 2018 and April 2019 involved an application programming interface ("API") solution for its clients in the financial industry.

3.    Defendant **SHANE HAMPTON** was a resident of Philadelphia, Pennsylvania. **HAMPTON** was the Chief of Financial Engineering at Hydrogen Technology from in or around November 2017 through in or around December 2022.

4.    Defendant **GEORGE WOLVAARDT** was a resident of Johannesburg, South Africa. **WOLVAARDT** was the Chief Technology Officer of Moonwalkers Trading Limited ("Moonwalkers") from in or around July 2018 through in or around January 2020. Moonwalkers was a South African entity that marketed itself as a provider of software-based "market-making" services for crypto assets.

5.    TYLER OSTERN was a resident of West Fargo, North Dakota, and Pelican Rapids, Minnesota. OSTERN was the President and CEO of Moonwalkers from in or around July 2018 through in or around January 2020.

6.    ANDREW CHORLIAN was a resident of New York, New York. CHORLIAN was a Blockchain Engineer at Hydrogen Technology from in or around November 2017 through in or around December 2018.

7.    The "blockchain" was a distributed public ledger that recorded incoming and outgoing crypto transactions.

8.    "Bitcoin" was a type of crypto asset. Bitcoin were generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin could be used for purchases or exchanged for other crypto assets on exchanges. Bitcoin was commonly known as BTC.

9.      "Ethereum" was a blockchain platform premised on "smart contracts," which were computer programs that automatically executed transactions when certain conditions were met.

10.      "ERC-20" was the technical standard for smart contract tokens created on the Ethereum blockchain platform.

11.      A "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others.

12.      A "Wash Trade" was a securities transaction that, among other things, involved no change in beneficial ownership of the security exchanged because the same individual or exchange account was both the seller and buyer in the transaction.

13.      A "Spoof Trade" was a securities transaction that, among other things, included a buy or sell order for a security placed without a legitimate intent to execute the order as placed or series of securities transactions creating actual or apparent active trading in a security for the purpose of inducing others to buy or sell such security.

14.      In or around February 2018, Hydrogen Technology created, or "minted," 11,111,111,111 ERC-20 tokens ("HYDRO"), which were investment contracts and therefore securities as defined by the Securities and Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

15.      Exchange-1 was a cryptocurrency exchange that was headquartered in Seattle, Washington.

## COUNT 1
### Conspiracy to Commit Offenses Against the United States
### (18 U.S.C. § 371)

1.      The General Allegations section of this Indictment is re-alleged and incorporated

by reference as if fully set forth herein.

2.      Beginning in or around June 2018, and continuing through in or around April 2019,

in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

### MICHAEL KANE,
### SHANE HAMPTON, and
### GEORGE WOLVAARDT,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy,

combine, conspire, confederate, and agree with each other and with others known and unknown to

the Grand Jury, including TYLER OSTERN and ANDREW CHORLIAN, to commit certain

offenses against the United States, that is:

      a.      Directly and indirectly, by use of the mails and any means and

instrumentality of interstate commerce, and of any facility of any national securities

exchange and any member of a national securities exchange, to willfully and for the

purpose of creating a false and misleading appearance of active trading in any security

other than a government security, and a false and misleading appearance with respect to

the market for such security, (A) effect any transaction in such security which involves no

change in the beneficial ownership thereof, and (B) enter an order and orders for the

purchase of such security with the knowledge that an order and orders of substantially the

same size, at substantially the same time, and at substantially the same price, for the sale

of any such security, has been and will be entered by and for the same or different parties,

and (C) enter any order and orders for the sale of any such security with the knowledge

4

that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same or different parties, in violation of Title 15, United States Code, Section 78i(a)(1); and

　　　　b.　　Directly and indirectly, by use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange and any member of a national securities exchange, to willfully effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, and in connection with any security-based swap or security-based swap agreement with respect to such security creating actual and apparent active trading in such security, and raising and depressing the price of such security, for the purpose of inducing the purchase and sale of such security by others, in violation of Title 15, United States Code, Section 78i(a)(2).

**Purpose of the Conspiracy**

3.　　It was the purpose of the conspiracy for **MICHAEL KANE, SHANE HAMPTON, GEORGE WOLVAARDT**, and their co-conspirators to unlawfully enrich themselves and Hydrogen Technology by introducing into the market materially false and misleading information about the supply and demand for HYDRO in order to fraudulently induce other market participants to buy and sell HYDRO and artificially inflate the price of HYDRO so that **KANE, HAMPTON, WOLVAARDT** and their co-conspirators could sell HYDRO at artificially inflated prices.

5

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose and objects of the conspiracy included, among others, the following:

4.     **GEORGE WOLVAARDT** and TYLER OSTERN, through Moonwalkers, were retained by **MICHAEL KANE**, **SHANE HAMPTON**, and ANDREW CHORLIAN, through Hydrogen Technology, to sell HYDRO on the open market on Exchange-1. **KANE** maintained with Exchange-1 an account in his name, which the co-conspirators agreed to use, and did use, to sell HYDRO.

5.     As part of the work for Hydrogen Technology, **GEORGE WOLVAARDT**, TYLER OSTERN, and others at Moonwalkers designed and implemented a trading strategy software application, or "bot," that placed automated orders on Exchange-1 in an effort to manipulate the price of HYDRO and sell HYDRO on behalf of Hydrogen Technology at artificially inflated prices.

6.     **MICHAEL KANE**, **SHANE HAMPTON**, **GEORGE WOLVAARDT**, and their co-conspirators agreed to use, and caused **WOLVAARDT** and TYLER OSTERN to use, the bot to place thousands of orders to buy or sell HYDRO on Exchange-1. **KANE**, **HAMPTON**, **WOLVAARDT**, and their co-conspirators, knew at the time that certain of these orders were not placed with a legitimate intent to buy and sell HYDRO but were intended instead to convey false and misleading information to other market participants about the market's supply and demand for HYDRO, deceive other market participants about the same, and fraudulently induce other market participants to buy and sell HYDRO (collectively, "Spoof Orders").

7.     **MICHAEL KANE**, **SHANE HAMPTON**, **GEORGE WOLVAARDT**, and their co-conspirators also agreed to use, and caused **WOLVAARDT** and TYLER OSTERN to use, the

bot to execute approximately 1,700 orders for HYDRO that involved no change in the beneficial ownership of HDYRO because the bot was executing orders with itself as both the buyer and seller of HYDRO in pre-arranged transactions through the Exchange-1 account in the name of **KANE** ("Wash Trades"). Like the Spoof Orders, **KANE**, **HAMPTON**, **WOLVAARDT**, and their co-conspirators knew at the time that the Wash Trades were intended to convey false and misleading information to other market participants about the market's supply and demand for HYDRO, deceive market participants about the volume of transactions in HYDRO, and fraudulently induce other market participants to buy and sell HYDRO.

8.      **GEORGE WOLVAARDT** and TYLER OSTERN designed the bot to execute Wash Trades and Spoof Orders, and openly promoted these features to **MICHAEL KANE**, **SHANE HAMPTON**, and ANDREW CHORLIAN, knowing that such conduct was unlawful.

9.      For example, on or about June 5, 2018, while designing the bot, **GEORGE WOLVAARDT** and TYLER OSTERN engaged in the following conversation on Telegram via interstate wire communications:

> **WOLVAARDT**: Ok. Sanity check time.
> Auto options:
> Spread kill
> Volume (wash trading)
> Cancel fake walls
>
> Semi auto:
> FOMO/FUD
> Order placement/cancel
> Buy/Sell up to
>
> Did I miss anything? Or are we ready to roll?
>
> OSTERN:      Their [sic] all options that can be turned on and off right?
> Sell order reversals / buy order reversals
>
> **WOLVAARDT**: Of course

OSTERN:        When someone sells and we're on "pump" then it'll automatically buy the next ask price in a small increment to make the graph look better.
And vice versa for sells.

10.    On or about October 1, 2018, TYLER OSTERN messaged **GEORGE WOLVAARDT**, and others, about how the bot's "Volume" (i.e., Wash Trading) and "Faux Buy Wall" (i.e., Spoof Trade) "feature[s]" were "illegal."

11.    **MICHAEL KANE**, **SHANE HAMPTON**, and **GEORGE WOLVAARDT** used a private Slack channel to communicate with each other and their co-conspirators in furtherance of the conspiracy. **KANE**, **HAMPTON**, **WOLVAARDT**, and their co-conspirators exchanged messages via interstate and foreign wires to coordinate the bot's execution of both the Spoof Orders and Wash Trades. **WOLVAARDT** and TYLER OSTERN also routinely updated **KANE**, **HAMPTON**, and ANDREW CHORLIAN via interstate and foreign wires about the status of the bot's manipulation of the price of HYDRO on Exchange-1.

12.    On or about October 21, 2018, TYLER OSTERN requested a call with **MICHAEL KANE** to discuss a manipulation strategy he wanted to employ:

OSTERN:        Set the bot pretty aggressively now that we've got a little more capital to play with.

**KANE**:        [Exchange-1] volume is getting really low, about $20 Mil in volume per day, we are working to get on some larger ones

OSTERN:        Right well [Exchange-2] is actually higher volume. Might push hard there to try and pick up some of that residual volume.
Sell side is thin too

**KANE**:        We used to have a lot of volume on [Exchange-2] ... it comes and goes

8

OSTERN: Hop in a call quick Mike [**KANE**]? Have a tactic we've used a few times that works, I'd like to explain a bit Basically we're going to insight [sic] a firesale to shake the weak hands, and get the sell walls to move down a bit so we gain position then push price hard.

**KANE**: Shane [**HAMPTON**] is owning this going forward, perhaps you can chat with him tomorrow morning? he is in the office

OSTERN: Sounds good. let us know what time.

**KANE**: let me check with him, probably around 11AM EST after all our morning meetings

**HAMPTON**: Yeah I'm not around [at the moment] but we can chat tomorrow

13.    As another example, on or around October 26, 2018, **MICHAEL KANE** and

OSTERN engaged in the following exchange regarding the bot's manipulation of HYDRO:

OSTERN: Did a little volume shennanigans .. we're top 4 on [Exchange-1]

OSTERN: Not sticking much though, everybody is in this for a quick profit. We'll shake the weak hands a bit then push again.

OSTERN: #1 volume on [Exchange-1]

**KANE**: Yes saw that, lots of volume It helps to attract other exchanges, we get 1-2 a week now to reach out

OSTERN: Around half is fake, took about 3 seconds for bot to generated about a million.

14.    **MICHAEL KANE**, **SHANE HAMPTON**, **GEORGE WOLVAARDT** and their

co-conspirators also discussed how to influence other potential investors of HYDRO through

social media.  For example, on or about October 29, 2018, the following exchange took place via

interstate wires on the Slack channel:

OSTERN: Try and stress people getting into the trade chat I kind of build trust in the trade chats and guide it up and down. Small detail but we have people putting up some pretty big sell walls we need out of the way if we want the price to go up much.

Otherwise we're stuck around 65-70 sats

Or we can nuke it and hope the walls move down, then recirculate them higher in high volume times. Up to you guys.

[Sorry. option 3, spend a little in transactions fees and pump volume again for some attention.]

**HAMPTON**: We try to not get involved in any talks involving trading on our telegram or social media

Spending some txn fees is fine

OSTERN: 10-4

Can [I] talk pass it on if somebody is speculating in chat?

CHORLIAN: Yeah I don't think there is an issue with anyone else directing people there

15.     **MICHAEL KANE**, **GEORGE WOLVAARDT,** and their co-conspirators also used a private Slack channel to coordinate payment to Moonwalkers for the manipulation of HYDRO and to ensure that an adequate supply of HYDRO and Bitcoin remained in **KANE**'s account on Exchange-1 to facilitate their scheme.  For example:

a.      On or about October 31, 2018:

OSTERN: @Shane Can we get a reload?

CHORLIAN: Only @Mike has access to the [Exchange-1] account on our team

OSTERN: Ahh 10-4.

Well, we ran out last night. So I just used the BTC to buy some more, and made you guys another 5 BTC with it

CHORLIAN: 

sadly mike isn't in the office so will be hard to get ahold of him. Will have to make sure we have a few of us with access going forward

> Do you have the [Exchange-1] deposit address?

OSTERN: That's alright, we can still work the price up so that when we do get a reload we'll have plenty of liquidity for better prices.

CHORLIAN: I can send you tokens from the trezor

b.    On or about December 1, 2018:

OSTERN: @Mike Need to reload the wallet.
We have 112 BTC in the account as well.
If you'd be willing, I think we could set the floor quite a bit higher if we push.
(112 not including what's in buy orders now)

**KANE**: Yes you can use more BTC if you want
let me arrange more hydro in the wallets now
there is another 150 Mil pending in [Exchange-1], should clear in next hour or two

c.    On or about December 9 and 10, 2018, **GEORGE WOLVAARDT**

requested payment from Hydrogen Technology and sent the address for his crypto wallet:

**WOLVAARDT**: Howsit guys. It's the 9th again.
38kthG6nNGhE5DietsEHyM9R2aFPwdnpnC
Assuming you are happy for us to continue, of course

CHORLIAN: Hey sorry don't have access to the wallets when I am out of the office. I will get that done asap

CHORLIAN: @George currently only have $8.5k in the trezor we work with. Working with Mike to get the last bit so we can get that over to you

16.    **MICHAEL KANE**, **SHANE HAMPTON**, and ANDREW CHORLIAN caused

Hydrogen Technology to pay **GEORGE WOLVAARDT** and TYLER OSTERN in Bitcoin in

exchange for **WOLVAARDT** and OSTERN's efforts to manipulate the price of HYDRO.

11

17. From in or around June 2018 through in or around April 2019, **MICHAEL KANE**, **SHANE HAMPTON**, and Hydrogen Technology profited approximately $2 million from the sale of HYDRO at artificially inflated prices as a result of the conspirators' manipulation efforts.

### Overt Acts

In furtherance of the conspiracy and to accomplish its unlawful purpose and objects, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1. On or about February 10, 2019, **MICHAEL KANE**, from within the Southern District of Florida, sent a payment of approximately 2.5 BTC from his account on Exchange-1 via interstate wires to a crypto wallet (outside the Southern District of Florida) controlled by **GEORGE WOLVAARDT** on behalf of Moonwalkers.

2. On or about February 11, 2019, **SHANE HAMPTON** sent an electronic communication (from outside the Southern District of Florida) to **MICHAEL KANE** (within the Southern District of Florida) stating that continuing to pay Moonwalkers still had "some value."

3. On or about March 8, 2019, **MICHAEL KANE**, from within the Southern District of Florida, sent a payment of approximately 2.3 BTC from his account on Exchange-1 via interstate wires to a crypto wallet (outside the Southern District of Florida) controlled by **GEORGE WOLVAARDT** on behalf of Moonwalkers.

All in violation of Title 18, United States Code, Section 371.

### COUNT 2
### Conspiracy to Commit Wire Fraud
### (18 U.S.C. § 1349)

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2.     Beginning in or around June 2018, and continuing through in or around April 2019, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**MICHAEL KANE,**
**SHANE HAMPTON, and**
**GEORGE WOLVAARDT,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, including TYLER OSTERN and ANDREW CHORLIAN, to commit wire fraud, that is, to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## **Purpose of the Conspiracy**

3.     It was the purpose of the conspiracy for **MICHAEL KANE**, **SHANE HAMPTON**, **GEORGE WOLVAARDT**, and their co-conspirators to unlawfully enrich themselves and Hydrogen Technology by introducing into the market materially false and misleading information about the supply and demand for HYDRO in order to fraudulently induce other market participants to buy and sell HYDRO and artificially inflate the price of HYDRO so that **KANE**, **HAMPTON**, **WOLVAARDT** and their co-conspirators could sell HYDRO at artificially inflated prices.

13

## Manner and Means of the Conspiracy

4.     The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as if fully set forth herein as a description of the manner and means of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 3 and 4
### Wire Fraud
### (18 U.S.C. §§ 1343 and 2(a))

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2.     Beginning in or around June 2018 and continuing through in or around April 2019, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

### MICHAEL KANE,
### SHANE HAMPTON, and
### GEORGE WOLVAARDT,

did knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice.

### Purpose of the Scheme and Artifice

3.     It was the purpose of the scheme and artifice for **MICHAEL KANE, SHANE HAMPTON, GEORGE WOLVAARDT**, and their accomplices to unlawfully enrich themselves

14

and Hydrogen Technology by introducing into the market materially false and misleading information about the supply and demand for HYDRO in order to fraudulently induce other market participants to buy and sell HYDRO and artificially inflate the price of HYDRO so that **KANE**, **HAMPTON**, **WOLVAARDT** and their accomplices could sell HYDRO at artificially inflated prices.

**The Scheme and Artifice**

4.      The Manner and Means section from Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as the description of the scheme and artifice.

**Use of Wires**

5.      On or about the dates below, in the Southern District of Florida, and elsewhere, **MICHAEL KANE**, **SHANE HAMPTON**, and **GEORGE WOLVAARDT**, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds, as described below, each corresponding to a separate count of this Indictment:

| Count | Approximate Date | Description of Wire |
|---|---|---|
| 3 | February 10, 2019 | 2.5 Bitcoin payment from **MICHAEL KANE**'s account on Exchange-1 (initiated from within the Southern District of Florida) sent to **GEORGE WOLVAARDT**'s crypto wallet (outside the Southern District of Florida). |

| Count | Approximate Date | Description of Wire |
|-------|------------------|---------------------|
| 4 | March 8, 2019 | 2.3 Bitcoin payment from **MICHAEL KANE**'s account on Exchange-1 (initiated from within the Southern District of Florida) sent to **GEORGE WOLVAARDT**'s crypto wallet (outside the Southern District of Florida). |

All in violation of Title 18, United States Code, Sections 1343 and 2(a).

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982)

1.      The allegations set forth in Counts 2 through 4 are realleged herein for purposes of seeking forfeiture to the United States of America, pursuant to Title 18, United States Code, Section 982(a), and Title 28, United States Code, Section 2461(c), of certain property in which each of the defendants, **MICHAEL KANE**, **SHANE HAMPTON**, and **GEORGE WOLVAARDT**, has an interest.

2.      Upon conviction of any of the offenses alleged in Counts 2 through 4 of this Indictment, the defendant so convicted shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United States Code, Section 2461(c), any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

3.      In the event that any of the property described above, as a result of any act or omission of defendant:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred or sold to, or deposited with, a third party;

   c.      has been placed beyond the jurisdiction of the court;

   d.      has been substantially diminished in value; or

16

e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeit substitute property up to the value of the afore-described properties pursuant to Title 18, United States Code, Section 982(a) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

GLENN S. LEON                                           MARKENZY LAPOINTE
CHIEF, FRAUD SECTION                                    UNITED STATES ATTORNEY

By: _____                    By: _____
    Glenn S. Leon                                       Markenzie Lapointe
    Chief, Fraud Section                                 United States Attorney
    U.S. Department of Justice                           Southern District of Florida

By: _____                    By: _____
    Andrew Jaco                                          Eric E. Morales
    Trial Attorney                                       Assistant United States Attorney
    Fraud Section                                        Southern District of Florida
    U.S. Department of Justice

    Scott Armstrong
    Assistant Chief
    Fraud Section
    U.S. Department of Justice

17

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.:** _____

**v.**

MICHAEL KANE, et. al.

**CERTIFICATE OF TRIAL ATTORNEY**

_____ /

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☒ Miami      ☐ Key West      ☐ FTP
☐ FTL        ☐ WPB

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3.  Interpreter: (Yes or No) No
    List language and/or dialect: _____

4.  This case will take __6__ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)      (Check only one)
    I    ☐ 0 to 5 days    ☐ Petty
    II   ☒ 6 to 10 days   ☐ Minor
    III  ☐ 11 to 20 days  ☐ Misdemeanor
    IV   ☐ 21 to 60 days  ☒ Felony
    V    ☐ 61 days and over

6.  Has this case been previously filed in this District Court? (Yes or No) No
    If yes, Judge _____ Case No. _____

7.  Has a complaint been filed in this matter? (Yes or No) No
    If yes, Magistrate Case No. _____

8.  Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
    If yes, Judge Altonaga                 Case No. 23-20165-CR

9.  Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: _____

Eric E. Morales
Assistant United States Attorney
FL Bar No.        1010791

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:     **MICHAEL KANE**

**Case No**:

Count #:   1

Conspiracy to Commit Offenses Against the United States

Title 18, United States Code, Section 371
* **Max. Term of Imprisonment:** 5 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000

Count #:   2

Conspiracy to Commit Wire Fraud

Title 18, United States Code, Section 1349
* **Max. Term of Imprisonment:** 20 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000 or twice the amount of the gross gain or gross loss amount

Counts #:   3-4

Wire Fraud

Title 18, United States Code, Section 1343
* **Max. Term of Imprisonment:** 20 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000 or twice the amount of the gross gain or gross loss amount

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:          **SHANE HAMPTON**

**Case No**:

Count #:    1

Conspiracy to Commit Offenses Against the United States

Title 18, United States Code, Section 371
* **Max. Term of Imprisonment:** 5 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000

Count #:    2

Conspiracy to Commit Wire Fraud

Title 18, United States Code, Section 1349
* **Max. Term of Imprisonment:** 20 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000 or twice the amount of the gross gain or gross loss amount

Counts #:    3-4

Wire Fraud

Title 18, United States Code, Section 1343
* **Max. Term of Imprisonment:** 20 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000 or twice the amount of the gross gain or gross loss amount

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: _____ **GEORGE WOLVAARDT** _____

**Case No**: _____

Count #:    1

Conspiracy to Commit Offenses Against the United States

Title 18, United States Code, Section 371
* **Max. Term of Imprisonment:** 5 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** NIA
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000

Count #:    2

Conspiracy to Commit Wire Fraud

Title 18, United States Code, Section 1349
* **Max. Term of Imprisonment:** 20 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000 or twice the amount of the gross gain or gross loss amount

Counts #:    3-4

Wire Fraud

Title 18, United States Code, Section 1343
* **Max. Term of Imprisonment:** 20 years imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:** Three (3) Years
* **Max. Fine:** $250,000 or twice the amount of the gross gain or gross loss amount

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**