UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20172

UNITED STATES OF AMERICA

v.

MICHAEL KANE

       **Defendant.**

_____/

## THE UNITED STATES' SENTENCING MEMORANDUM AND OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

The United States, by and through its undersigned counsel, files this brief in response to Defendant Michael Kane's Presentence Investigation Report ("PSR") and his objections thereto. D.E. 129, 153, 157. While Defendant lodged numerous objections to the PSR, the government's response focuses only on those issues that are relevant to Defendant's United States Sentencing Guidelines ("Guidelines") calculations. Specifically, this brief explains why Defendant is responsible for a loss amount greater than $1.5 million but not greater than $3.5 million, why each of the enhancements applied in the PSR is appropriate, and why Defendant is not eligible for a two-level reduction under the newly-adopted zero-point offender provision.

## FACTUAL BACKGROUND

### A. The Offense Conduct

Defendant was indicted on April 20, 2023, and charged with one count of conspiracy to commit securities price manipulation, one count of conspiracy to commit wire fraud, and two substantive counts of wire fraud. On November 30, 2023, Defendant pleaded guilty to all four counts. Specifically, Defendant pleaded guilty to conspiring with others to execute a months' long scheme—from June 2018 to April 2019—to commit securities-price manipulation and wire fraud.

At the time of the conspiracy, Defendant was the CEO and controlling shareholder (along with his twin brother) of Hydrogen Technology. In early 2018, Defendant and his company created approximately 11 billion crypto tokens on the Ethereum blockchain. Ex. A, Trial Testimony of Andrew Chorlian, Trial Tr. Vol. II at 52, 56. They named the token HYDRO. Shortly after their creation, Defendant gave himself and his brother approximately 1.3 billion HYDRO tokens (roughly 12.5% to each of the total supply of HYDRO) and gave two of his employees and co-conspirators—Shane Hampton and Andrew Chorlian[1]—approximately 277 million HYDRO tokens each (roughly 2.5% to each of the total supply of HYDRO). *Id.* at 57–58. Defendant, through Hydrogen Technology, gave away approximately 25% of the tokens in an effort to get HYDRO into the hands of a large number of people outside the company. *Id.* at 59. The remaining 45% of the HYDRO tokens were held in various company repositories for sale and future distribution. Accordingly, Defendant, his brother, his company, and two key employees controlled approximately 75% of the total supply of HYDRO after it was created.

Defendant claimed publicly that the HYDRO tokens were "utility" tokens that would be used by businesses and consumers within a set of blockchain-based protocols that Hydrogen Technology was developing. Ex. B, Michael Kane Telegram Posts. Although the company made some efforts to develop these software applications, they ultimately were not successful in gaining any market adoption for the blockchain-based protocols or the HYDRO tokens. Ex. A at 172–73. Despite knowing this, throughout the summer and fall of 2018, Defendant repeatedly made false public statements misrepresenting the status of the protocols and the level of interest from companies in using the protocols and the HYDRO tokens. Ex. B. These misrepresentations created the false

---

[1] These two individuals were also charged as part of the scheme. One of them, Shane Hampton, was charged in the same indictment as Defendant and was convicted of conspiracy to commit securities price manipulation and conspiracy to commit wire fraud after a seven-day jury trial before Judge Seitz. The other, Andrew Chorlian, was charged by information with conspiracy to commit securities price manipulation and wire fraud, pleaded guilty, and testified as a cooperating witness at Hampton's trial.

2

impression that there was legitimate demand for the token and helped to induce investors to purchase the tokens under the belief that it would soon be purchased and used by large companies and millions of their customers.

At the same time, Defendant, and others at Hydrogen Technology acting at his direction, began taking steps to get HYDRO listed on crypto-token exchanges in order to sell tokens to raise funds for the company. Ex. A at 60, 69, 77, 134–35. After getting the token listed on various exchanges, Defendant began trying to sell the tokens himself to raise capital, but there was not sufficient demand in the market to support Defendant's desired volume of sales. *Id.* at 62, 69. At the time Defendant began selling the tokens, and indeed throughout the entire conspiracy and to this day, the token never had any actual utility or users, and therefore there was little actual demand for the token. *Id.* at 63–64, GX001-055. What demand did exist was purely from investors purchasing the token as a speculative vehicle. *Id.* at 61–62, 64. As a result, if Defendant and his co-conspirators had sold all the tokens they wanted to at unmanipulated market prices, it would have crashed the price of the token. *Id.* at 64, 70.

Accordingly, Defendant instructed Hampton—one of his employees and co-conspirators—to find a "market maker" to help him and the company sell more tokens. *Id.* at 64–65. In October 2018, Defendant, Hampton, and Chorlian hired a company called Moonwalkers to use a custom-designed trading software bot to place thousands of spoof orders and wash trades for the HYDRO token on a crypto trading exchange called Bittrex. *Id.* at 65. The bot was specifically designed to engage in manipulative conduct and these features were openly advertised to Defendant and others at the time they engaged Moonwalkers to operate the bot. *Id.* at 65–69. Defendant and his co-conspirators used the bot to flood the market with fake orders for HYDRO, significantly inflating the trading volume of the token in an effort to mislead other investors and induce them to buy and sell HYDRO at inflated prices. *Id.* Defendant and his co-conspirators also openly discussed the manipulation for months in

3

a Slack channel. *Id.* at 86; *see* GX001. Defendant paid Moonwalkers in Bitcoin in exchange for their manipulation of the market for the HYDRO token. *Id.* at 102.

Moonwalkers began working for Defendant and Hydrogen Technology in October 2018 and operated the bot on Bittrex through early April 2019.[2] Ex. C, Trial Testimony of Tyler Ostern, Trial Tr. Vol. IV at 10. During this six-month period, Defendant and his co-conspirators used the bot to wash trade over 1.5 billion HYDRO tokens worth approximately $6.5 million. GX702-003. And in October 2018 alone, Defendant and his co-conspirators placed spoof orders for nearly 30 billion tokens worth over $130 million. *Id.* at -006. In total, they spammed the Bittrex order book with spoofs totaling 100 billion tokens worth over $300 million. *Id.* All of this was fake volume intended to deceive and trick other investors into thinking there was legitimate demand for the HYDRO token to induce them to buy HYDRO from Defendant and his co-conspirators at artificially inflated prices. Ex. C at 8, 12, 19; Ex. D, Michael Kane Change of Plea Hearing Tr. at 25–26.

The scheme worked. At trial, two victims testified that they had seen the HYDRO trading volume going up on Bittrex in the fall of 2018 and they thought it was real people, like them, buying and selling the token. Ex. E, Trial Testimony of Mark Taylor and Daryl Berke, Trial Tr. Vol. III at 181–82, 200–02. They viewed this trading activity as a sign of legitimate demand for the HYDRO token, which indicated a healthy market and a potential for them to profit. *Id.* These individuals also testified that they saw statements made by Defendant and his company regarding the protocols they were building that would one day use the HYDRO tokens, further increasing their demand. *Id.* at 180, 182–83, 198–99.

---

[2] During at least part of the conspiracy, Defendant and his co-conspirators also used the bot to manipulate the market on another exchange called Coinex. The United States was not able to obtain trading data from Coinex in order to determine the full scope of manipulation on that exchange. According to documents produced by Defendant and Hydrogen Technology, however, Defendant and his company generated over $700,000 in profits via sales on Coinex. *See* Ex. J, HYDRO Trade Market Values, Total. Accordingly, Defendant's claim that "there was no manipulation in any of the other sales" is false. D.E. 153 at 12.

Unfortunately for these individuals and thousands of others like them, none of it was true. Testimony and other evidence at trial showed that a significant portion of the HYDRO trading volume on Bittrex was fake volume generated by Defendant and his co-conspirators. Ex. C at 13, 20, 24–25; *see* GX702. And testimony from Andrew Chorlian, as well as Defendant's own messages, showed that Defendant and his company had not generated actual demand for the token and that none of the clients Defendant had repeatedly alluded to in public statements were actually using the HYDRO token. Ex. A at 172–73; GX001-055. In the end, over 5,500 individuals lost approximately $3.6 million buying and selling HYDRO on Bittrex during the time period Defendant and his co-conspirators were operating the bot. Ex. F, Declaration of FBI Forensic Accountant Allison Williams, at ¶ 11. At the same time, Defendant and his company reaped profits of over $1.5 million from their HYDRO sales. *Id.* at ¶ 10; GX702-007.

### B. The Applicable Guidelines Range

Pursuant to U.S.S.G. § 2B1.1, Defendant has a base offense level of seven. The amount of loss, as measured by the gain that resulted from the offense, is more than $1,500,000 but not more than $3,500,000, resulting in an increase of sixteen levels, pursuant to Section 2B1.1(b)(1)(I). The scheme involved 10 or more victims and employed sophisticated means, warranting a two-level increase under Section 2B1.1(b)(2)(A)(i) and another two-level increase under Section 2B1.1(b)(10)(C). Defendant was an organizer/leader of the scheme, which involved five or more individuals, warranting a four-level increase under Section 3B1.1(a). And Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation of the instant offense of conviction, warranting a two-level increase under Section 3C1.1. Accordingly, Defendant's total offense level is 33. As noted in the final PSR, the zero-point-offender adjustment does not apply because the defendant had an aggravating role in the crime. D.E. 157-1, at 6–7. Defendant is, however, entitled to a three-point reduction for his timely acceptance of

responsibility. Thus, the PSR properly calculates Defendant's total offense level, accounting for his acceptance of responsibility, as 30, with a corresponding Guidelines range of 97–121 months. *Id.* at 39.

### C. Defendant's Objections

Defendant's Objections to the Presentence Investigation Report (D.E. 153) should be denied. In his motion, Defendant makes five claims of error that impact his guidelines: (1) incorrect loss amount; (2) incorrect application of the organizer/leader enhancement; (3) incorrect application of the enhancement for 10 or more victims; (4) incorrect application of the obstruction enhancement; and (5) failure to credit him with the first-time offender reduction.[3] None is persuasive. The recommendations made by U.S. Probation as to the sentencing guidelines calculations should be adopted by this Court.

## ARGUMENT

### A. Defendant's Loss Amount

Defendant is responsible for a loss of more than $1.5 million but not greater than $3.5 million. The PSR properly applies, and the United States properly proposes, a 16-level enhancement, because under any method of calculating loss employed by the Court, the amount is at least $1.5 million.

Loss, under U.S.S.G. § 2B1.1(b)(1), is the greater of actual loss or intended loss, where "actual loss" "means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 Appl. n.3(A)(i). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money" and "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of

---

[3] Defendant also lodged voluminous other objections to the PSR. Because those portions of the PSR have no bearing on his Guidelines calculation, they are not addressed herein. Many of Defendant's arguments, however, are off base. As just one example, Defendant repeatedly takes issue with the PSR's use of the term "price" when describing his manipulation. Defendant suggests that he was only manipulating the "volume" of HYDRO and not its "price." But Defendant pleaded guilty to conspiring to commit securities *price* manipulation, explicitly acknowledging during his change of plea hearing that he and his co-conspirators manipulated the market "so that [they] could sell Hydro at artificially inflated prices." Ex. D at 26.

6

the offense." *Id.* at Appl. n.3(A)(iii)–(iv).  When calculating loss, "[t]he court need only make a ***reasonable estimate*** of the loss." *Id.* at Appl. n.3(C) (emphasis added); *see United States v. Melgen*, 967 F.3d 1250, 1265 (11th Cir. 2020); *see also United States v. Sullivan*, 765 F.3d 712, 716 (7th Cir. 2014) (absolute accuracy is not required as long as the calculation is not "outside the realm of permissible computations" (internal citations omitted)).

### i. The Court Should Use Gain as an Alternative Measure of Loss

The Guidelines instruct that the Court should use the gain that resulted from the offense as an alternative measure of loss if there is a loss but it cannot reasonable be determined. U.S.S.G. § 2B1.1 Appl. n.3(B).  *See United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009); *see also United States v. Vrdolyak*, 593 F.3d 676, 681 (7th Cir. 2010) (holding that gain may appropriately be used as an alternative measure for loss even where there is only a "*probable* loss").  Because individuals indisputably lost money as a result of Defendant's scheme but their exact losses are difficult, if not impossible, to measure, the Court should use the gain from the conduct as an alternative measure of loss.

Defendant cannot legitimately dispute that his fraud caused HYDRO investors to lose money. Indeed, two such investors testified at trial that they lost thousands of dollars investing in HYDRO after deciding to invest when they saw the token's trading volume shoot up on Bittrex.  Defendant concedes, as he must, that these individuals lost money but claims that those losses "were not fully caused by the instant scheme." D.E. 153 at 13.  Even assuming Defendant is correct,[4] and their losses are not "fully" attributable to his conduct, these individuals and thousands of others still lost money as a result of the scheme.  Because evidence of actual loss was documented and before the Court,

---

[4] Defendant is in fact incorrect.  The two individuals at issue testified that (1) they purchased HYDRO on Bittrex after they saw its volume increasing on the exchange, leading them to believe there was legitimate demand for the token; and (2) they never would have purchased the token on Bittrex had they known that a significant portion of the volume on that exchange was fake volume generated by Defendant and his co-conspirators.  They were induced to purchase HYDRO by the false representations put into the market by Defendant and his co-conspirators.  Accordingly, their losses and those of many others just like them were "fully caused" by Defendant's scheme.

Defendant's gain may properly be used as a measure of loss, assuming the actual loss cannot reasonably be determined.  Ex. E at 190, 204–05.

Where, as here, over 5,600 people lost money investing in HYDRO at various times and in various amounts during the conspiracy, it is difficult if not impossible to determine the exact amount of loss that is attributable to the scheme and that which is attributable to other market factors.  This case, like others involving market manipulation, "exemplifies the type of logistical burdens the gain-for-loss approach was designed to alleviate."  *United States v. Coscia*, 866 F.3d 782, 801 (7th Cir. 2017); *see also United States v. Campbell*, 765 F.3d 1291, 1304–05 (11th Cir. 2014) (rejecting defendant's "'bottom-up' approach to calculating loss" where "defendant's conduct was permeated with fraud"); *United States v. Orton*, 73 F.3d 331, 334–35 (11th Cir. 1996) (explaining that "an exhaustive inquiry is not required in every case" involving a complicated fraudulent scheme in which the victims' loss is difficult to calculate).  Here, Defendant's conduct related to the creation, distribution, and sale of HYDRO was "permeated with fraud."  *Campbell*, 765 F.3d 1291, 1305.  Defendant's scheme was incredibly complex, using a trading bot to place thousands of anonymous trades per minute, interspersing wash trades, spoof orders, and numerous other manipulative tactics with real orders timed to buy low and sell high.  Defendant not only manipulated the price upwards at times but also intentionally manipulated the price of HYDRO *downwards* to "gain position" and buy HYDRO at lower prices that could then be resold at higher prices following another round of manipulation.  Defendant "made money by artificially inflating and deflating prices. Every time he did so, he inflicted a loss," and the parties who traded across from him "were always harmed by the artificial shift in market price."  *Coscia*, 866 F.3d at 801–02.  Accordingly, the Court can and should use the gain from the scheme as a measure of loss.[5]

---

[5] Indeed, the loss amount determined by U.S. Probation and the government is a conservative estimate.  Evidence introduced at the trial of Defendant's co-conspirator showed that the conspirators' net profits from sales of HYDRO on Bittrex during the time period they were operating the bot were $1,574,066.  This figure does not include any of Defendant's sales of HYDRO on Coinex, another exchange where the co-conspirators generated at least $700,000 in

Defendant's arguments to the contrary are meritless. Defendant primarily contends that his gain should not be used as a measure of loss because there was no "tell-tale spike" in the price of HYDRO after the manipulation began. But that is irrelevant. He points to no provision of the Guidelines or caselaw to support this argument. Under the Guidelines and relevant case law, all that matters is that there were losses (which was established through testimony and documents at trial) and the full extent of those losses cannot reasonably be calculated.

Moreover, Defendant's argument rests on a logical fallacy. He assumes that, because the price of HYDRO did not go up significantly as a result of the manipulation, the price of the token was not impacted by the manipulation. But the data in fact show the opposite. The data show that Defendant's manipulation helped to *maintain* the price of HYDRO, despite Defendant offloading billions of tokens onto the market, allowing Defendant and his co-conspirators to sell their tokens at a higher price than they otherwise would have and causing new market participants to purchase HYDRO at inflated prices.[6] Indeed, testimony at trial showed that Defendant and his co-conspirators hired Moonwalkers for exactly this reason—they were concerned that their sales of HYDRO would crash the price of the token given that they controlled over 60% of the total token supply. Ex. A at 64, 70; Ex. C at 91, 100. Defendant's manipulation allowed him to sell billions of tokens without crashing the price, which was critical to the scheme's success. And as a result, countless individuals purchased HYDRO at artificially-inflated prices. Moreover, Defendant also engaged in manipulation designed to drive the price of HYDRO down, negatively impacting the value of HYDRO held by other market participants.

---

profits while actively manipulating the market on that exchange. This figure also does not include any of Defendant's sales of HYDRO prior to engaging Moonwalkers even though all of these sales occurred while Defendant was repeatedly making public statements that falsely represented the level of interest in the token from large companies and consumers. *See* Ex. B.

[6] According to Defendant, his co-conspirator Mr. Chorlian's "dumping" of tokens "could have caused investor losses." Mr. Chorlian sold approximately 270 million HYDRO tokens between November 2018 and April 2019. By comparison, Defendant and his co-conspirators sold almost 4 billion tokens on Bittrex alone. If, as Defendant admits, Chorlian's "dumping" of tokens caused investor losses, then *Defendant's* dumping of over 14 times as many tokens while simultaneously flooding the market with hundreds of billions of tokens' worth of fake orders certainly caused investor losses.

9

*Id.* at 100–01. Anyone who was unfortunate enough to sell during a time when Defendant and his co-conspirators were actively manipulating the price downwards was harmed and lost money as a result of Defendant's conduct.

### ii. Other Loss Calculation Methods Would Result in an Equal or Greater Sentence

Using gain as a measure of loss is in fact favorable to Defendant as it results in a more conservative estimate of loss than other methods available to the Court. The Court could look to the total losses (over $3.6 million) incurred by investors on Bittrex during the time period the bot was operating. Alternatively, the Court could look to the total losses (over $2.4 million) incurred by only those investors who first purchased HYDRO on Bittrex after the manipulation started (i.e., individuals who were more clearly induced to purchase as a result of the manipulation). Finally, the Court could use the Modified Rescissory Method (over $7.8 million), which is specifically contemplated by the Guidelines for securities price manipulation schemes. Under any of these approaches, Defendant's loss amount would be well over $1.5 million, and could potentially climb over $3.5 million, which would result in an additional two-point increase in his Guidelines calculation.

Specifically, the Guidelines provide that special rules shall be used to assist in determining loss in certain types of cases, including in cases that involve the fraudulent inflation or deflation in the value of securities. U.S.S.G. 2B1.1, Appl. n.3(F)(ix). "In a case involving the fraudulent ***inflation or deflation*** in the value of a publicly traded security or commodity, the court in determining loss may use ***any method that is appropriate and practicable*** under the circumstances." *Id.* (emphases added). "One such method is calculating the difference between the average price of the security during the period that the fraud occurred and the average price of the security during the period that the fraud occurred and the average price of the security during the 90-day period after the fraud was

10

disclosed to the market and multiplying the difference in average price by the number of shares outstanding."[7] *Id.* Under this method, Defendant's loss amount would be approximately $7.8 million.

Defendant also suggests that his loss amount cannot be different from that determined for Chorlian and Ostern, two of his co-conspirators. To the extent Defendant challenges the proposed loss amount on these grounds, his challenge is not as to the Guidelines calculation but rather to the reasonableness of his potential sentence under 18 U.S.C. § 3553(a). "In imposing a sentence, district courts must consider several factors, including the need 'to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Abovyan*, 988 F.3d 1288, 1311 (11th Cir. 2021). It is well settled, however, "that codefendants and even coconspirators may be sentenced differently for the same offense." *United States v. Pierce*, 409 F.3d 228, 235 (4th Cir. 2005); *see U.S. v. Quinn*, 359 F.3d 666, 682 (4th Cir. 2004) (holding that "mere disparity among co-defendants' sentences is not a permissible ground for departure. . . . even where the disparity results from the use of different loss figures for co-defendants"). Here, Defendant is not "similarly situated" to Chorlian and Ostern because the latter two "pled guilty and their plea agreements provided for how loss was to be determined." *Abovyan*, 988 F.3d at 1311 (11th Cir. 2021). Accordingly, "any disparity between the sentences of [Defendant] and them is not an 'unwarranted' sentence disparity within the meaning of § 3553(a)(6)." *Id.*

### B. Defendant Should Receive an Organizer/Leader Aggravating Role Adjustment

The PSR correctly applies a four-point enhancement based on Defendant's role as a leader of the conspiracy. Courts are advised to look at seven factors in determining a defendant's aggravating

---

[7] Here, the fraud was not explicitly "disclosed" to the market. Instead, by Defendant's admission, the trading bot's manipulation began and ended at precise points in time. As a result, the modified rescissory method is particularly apt here given the ease with which the price can be measured during the price manipulation (i.e., when the bot was operating) and in the 90-day window following the manipulation. According to publicly available price history data (admitted into evidence by the Court at Hampton's trial, *see* DX137), the average price of HYDRO during the bot's operation was $0.002307 and its average price during the 90-day period following the bot's operation was $0.001602, resulting in a price difference of $0.000705. Multiplying that value by the total outstanding shares of HYDRO (11,111,111,111) results in an estimated loss amount of over $7.8 million.

11

role enhancement under USSG § 3B1.1(a): (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *See* Appl. n.4, USSG § 3B1.1. The commentary anticipates there can be more than one leader of a criminal scheme. *Id*. In fact, the "defendant does not have to be the sole leader or kingpin of the conspiracy to be considered an organizer or leader within the Guidelines." *United States v. Rendon*, 354 F.3d 1320, 1332 (11th Cir. 2003); see *United States v. Lovell*, 579 F. App'x 875, 876 (11th Cir. 2014) (affirming leader/organizer enhancement and finding that defendant's "exertion of control over at least one other person in the conspiracy qualifie[d] him as an organizer or leader").

Every one of the seven factors relevant under the Guidelines applies to Defendant and counsels in favor of an aggravating role enhancement.

- **Decision-Making Authority** – Defendant was the CEO of Hydrogen Technology, which was a small start-up company founded and operated by Defendant and his twin brother. Defendant controlled the Bittrex account that was used to operate the trading bot and manipulate the market. Defendant controlled the crypto wallets and accounts that were used to supply Moonwalkers with more HYDRO to sell and more Bitcoin to use for manipulation and as payment for their services. Ex. A at 50; GX001-014, -020.

- **Participation in Commission of Offense** – Defendant used his personal account on Bittrex, which he converted to a corporate account, to facilitate the fraud. He initially authorized hiring Moonwalkers and continued to authorize payments to Moonwalkers despite knowing that Moonwalkers was engaging in rampant market manipulation on behalf of him and his company. And Defendant made repeated false statements and representations to potential HYDRO investors regarding his company's progress in developing the HYDRO protocols and generating interest in them from potential customers. Ex. G, Trial Testimony of Bittrex Custodian David Maria, Trial Tr. Vol. V at 14; Ex. B; fGX125; GX127; and GX001.

- **Recruitment of Accomplices** – Defendant unilaterally awarded Hampton and Chorlian each 2.5% of the total share of HYDRO tokens and instructed Chorlian and Hampton to search for outside firms to help them sell HYDRO tokens. Defendant

      authorized the hiring and payment of Moonwalkers to facilitate the fraudulent sale of his company-owned tokens.  Ex. A at 57–58; GX125; GX127; and DX113/197.

- **Claimed Right to a Larger Share of Profits** – Defendant gave himself and his twin brother 25% of the total supply of HYDRO tokens immediately after creating them and gave his company an additional 45% of the supply.  And Defendant, as the majority shareholder in Hydrogen along with his twin brother, reaped almost all the profits and benefits from the fraud.  Ex. A at 57–58; PSR at 37, ¶123.

- **Planning/Organizing Offense** – Defendant decided to create 11 billion crypto tokens, the majority of which were controlled by him and his company.  And Defendant decided to sell those tokens to raise funds for his company.  After he was unable to sell as many tokens as he desired, Defendant sought the assistance of Moonwalkers to sell tokens on his behalf while manipulating the market for the token and defrauding investors.  Ex. A at 52, 56–58, 60, 69, 77, 134–35; GX120.

- **Nature and Scope of Illegal Activity** – Defendant and his co-conspirators' manipulation completely corrupted the market for HYDRO.  Defendant and his co-conspirators used their trading bot to wash trade over 1.5 billion HYDRO tokens worth approximately $6.5 million.  And they spammed the Bittrex order book with spoofs totaling 100 billion tokens worth over $300 million.  GX702, Ex. F.

- **Degree of Control and Authority Exercised Over Others** – Two of Defendant's co-conspirators, Chorlian and Hampton, were his employees.  He directed their day-to-day activities, both as it related to legitimate parts of the business and the criminal conduct at issue here.[8]  Ex. A at 50.

Defendant's only argument in opposition to this enhancement is that two of his co-conspirators were not also given aggravating role enhancements.  Again, however, this argument misses the point.  *See Abovyan*, 988 F.3d at 1311; *Pierce*, 409 F.3d at 235.  The question is whether *Defendant*, based on the guidelines and the facts of the case, was a leader or organizer of the criminal conduct.  Defendant was indisputably a leader and organizer of the criminal activity at issue here and he does not suggest otherwise.  And to the extent Defendant seeks a variance based on alleged sentencing disparities between him and his co-conspirators, it is not warranted because, as explained above, they are not "similarly situated." *Abovyan*, 988 F.3d at 1311.  Chorlian and Ostern pleaded guilty pursuant to agreements with the government almost one year before trial in this case.

---

[8] At bare minimum, because Defendant was the manager and supervisor of both Hampton and Chorlian and the criminal activity involved 5 participants, he is subject to a three-level increase pursuant to §3B1.1(b).

13

Defendant had no such agreement. Moreover, both Chorlian and Ostern sought mitigating role adjustments at their sentencings which the government objected to strenuously.

### C. Defendant's Criminal Conduct Involved 10 or More Victims

Defendant's criminal conduct clearly involved ten or more victims. During the time period that Defendant and his co-conspirators were operating the bot on Bittrex, over 5,500 individuals lost money investing in HYDRO. Moreover, 7,294 of the individuals who lost money made their first ever purchase of HYDRO on Bittrex only after Defendant and his co-conspirators began manipulating the market for HYDRO. *Id.* at ¶ 11. In other words, 7,294 people invested in HYDRO only after Defendant and his co-conspirators began flooding the market with fake volume, making it look as though significant, legitimate demand existed for the token.

At bare minimum, every one of the individuals who first bought HYDRO on Bittrex after Defendant's manipulation and deception began is a victim of his crime.[9] Defendant pleaded guilty to placing wash trades and spoof orders through the bot that "were intended to send false and misleading information to other market participants about the market supply and demand for HYDRO, to deceive market participants about the same, and to fraudulently induce other market participants to buy or sell HYDRO." Ex. D at 25. By pleading guilty to the crimes at issue, Defendant has already admitted that he targeted other investors on Bittrex and made false representations to them about the true supply and demand for HYDRO. He cannot now claim that those very same individuals, who purchased HYDRO only after Defendant flooded the market with false representations, were not victims of his crime.

---

[9] Restricting the victim analysis to just those individuals who purchased HYDRO on Bittrex after Defendant's manipulation began almost certainly understates the true number of victims. Given Defendant's control of the majority of the total supply of HYDRO and his aggressive manipulation of the token's volume and price (plus his manipulation of the token on Coinex), it is probable that every person that purchased bought or sold HYDRO *on any exchange* was harmed by Defendant's conduct.

Defendant, however, tries to do just that. First, Defendant suggests that only individuals who testified at the trial of his co-defendant may be considered "victims." In general, a "victim" is a person who suffered an "actual loss" or an individual who "sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1 Appl. n.1. The ten individuals identified by their initials in the PSR suffered "actual losses" as a result of Defendant's criminal conduct and those losses are identified in the PSR.[10] Nothing more is required to support this enhancement. *See, e.g.*, *United States v. Graveran-Palacios*, 835 F. App'x 436, 445 (11th Cir. 2020) (affirming district court's application of ten-or-more victim enhancement where "PSR identifies the . . . victims of the conspiracy and states the loss amount for each").

Second, Defendant makes the unsupported suggestion that some unknown number of the ten specific individuals identified by the United States for the US Probation Office may have been the alter egos of Defendant's co-conspirator, Tyler Ostern. The ten specific victim names provided by the United States, as well as at least another 400 plus for whom the United States obtained KYC information from Bittrex are very much real people. Indeed, two of them testified at Hampton's trial and others have begun submitting victim impact statements to the Department of Justice in the wake of Defendant's crime. Defendant's suggestion that these individuals, who lost a combined $137,000, were in fact alter egos of his own co-conspirator apparently trading and losing money against his own bot is not credible.

### D. Defendant Obstructed the Administration of Justice

Although Defendant objects to the obstruction enhancement, he admits that he personally altered the Slack channel—named #Moonwalkers—used by him and his four co-conspirators to

---

[10] As explained above, at minimum, every person who first bought HYDRO on Bittrex only after Defendant and his co-conspirators were manipulating the market was harmed as a result of his conduct. Defendant "made money by artificially inflating and deflating prices. Every time he did so, he inflicted a loss." *Coscia*, 866 F.3d at 801–02 (explaining that defendant's spoof trades "injured those who traded with him . . . [because] these parties were always harmed by the artificial shift in market price").

15

execute their fraud. Despite Defendant's attempts to destroy this evidence, the government fortunately obtained an unaltered copy of the #Moonwalkers channel via another source. That Slack channel proved to be the key piece of evidence in the case. Defendant makes light of his conduct, suggesting that he acted irrationally and that he always knew his actions and the true contents of the #Moonwalkers channel would be discovered. Defendant's explanation is not credible.

First, Defendant did not act irrationally. To the contrary, he meticulously destroyed, line by line, over a 50-plus page document, every arguably inculpatory message in the Slack channel. The #Moonwalkers channel, as Defendant knew from his conduct, was undoubtedly the key piece of evidence against him and his co-conspirators. It provided a running narrative of the crime from start to finish, with the co-conspirators blatantly discussing their manipulation of the market for HYDRO. The unaltered version of the #Moonwalkers channel was Government Exhibit 1 at Hampton's trial. It is not hyperbole to say that, without that Slack channel, none of the four individuals who have been convicted in this case would have been held accountable for their crimes. Defendant's conduct shows a willful and blatant disregard for the administration of justice, and that conduct should not be excused just because the United States was fortunate enough to obtain by other means the very evidence he destroyed.

Second, Defendant went one step further, deleting the entire Slack channel, in an effort to hide his crime. Pursuant to a search warrant, the government obtained the entire contents of Hydrogen Technology's Slack account dating back to January 1, 2018. The #Moonwalkers channel, however, was nowhere to be found. Slack did, however, produce an activity log that recorded every instance of a channel being deleted, including the date and time it was deleted and the user who deleted the channel.[11] Ex. H, Hydrogen Technology Slack Account Channel Deletion Log. That log shows that,

---

[11] Unfortunately, the activity log identifies channels only by their unique 12-digit identifiers, and not by the names assigned to them by users (e.g., #Moonwalkers). The fact that the #Moonwalkers channel is no longer available, however, indicates that it is one of the deleted channels listed on the activity log.

on or about May 15, 2020, approximately two months after first receiving a subpoena from the Securities and Exchange Commission seeking, among other things, communications with or concerning Moonwalkers, Defendant personally deleted 17 channels on the Hydrogen Technology Slack account. *Id.* Approximately, one month later, on or about June 17 and 24, 2020, Defendant personally deleted an additional 15 Slack channels. *Id.* Defendant was the only person to delete *any* Slack channel on the Hydrogen Technology account after receiving the first subpoena from the SEC, and he deleted a total of 33 channels over a two-month period. *Id.* One of those channels was the #Moonwalkers Slack channel. Notably, prior to receiving that subpoena, a total of only five channels had been deleted from the Hydrogen Technology Slack account over the preceding *two-plus years*. *Id.* Moreover, no additional channels were deleted in the two years following Defendant's spate of deletions over the summer of 2020. *Id.*

### E.  Defendant Does Not Qualify for a Two-Point Reduction Under 4C1.1

If the Court agrees with the government and Probation regarding Defendant's aggravating role, he does not qualify for the zero-point offender reduction. Section 4C1.1 of the Guidelines provides that, *inter alia*, an offender who receives an aggravating role adjustment under § 3B1.1 does not qualify for the reduction. This is true even if the Court opts to apply only a three-level increase under § 3B1.1(b) based on Defendant's role as a manager and supervisor.

Defendant contends that, even if he receives an aggravating role enhancement, he may still qualify for a reduction under § 4C1.1. Not so. Section 4C1.1 plainly states that a defendant qualifies for the reduction only if he "meets all of the following criteria." The last of these criteria is that the defendant "did not receive an adjustment under §3B1.1 (Aggravating Role) *and* was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." U.S.S.G. § 4C1.1(a)(10). In other words, Defendant has the burden to show that he did not receive an aggravating role adjustment *and* to show that he was not engaged in a continuing criminal enterprise. If he fails to make either one of

17

these showings (or any of the other nine requirements contained in 4C1.1(a)), he is not entitled to the reduction. *See, e.g.*, *United States v. Miguel Rodriguez-Orejuela*, Case No. 03-cr-20774, Order Denying Motion for Two Level Reduction, D.E. 338 (Nov. 16, 2023) ("Defendant is excluded from benefiting from [the 4C1.1] reduction because he received a four level enhancement for his role in the offense."). Defendant's reading flips this text on its head. According to Defendant's reading, if any one of the ten requirements does not apply to him, he is entitled to the reduction. This is a patently incorrect reading of the plain language of § 4C1.1.

Moreover, as the PSR correctly notes, the U.S. Sentencing Commission has clarified that it intended § 4C1.1(a)(10) to exclude any defendant who received an aggravating role adjustment *or* was engaged in a continuing criminal enterprise. In a December 2023 proposed technical amendment, the Commission stated that it "intended §4C1.1(b)(10) to track the safety valve criteria at 18 U.S.C. § 3553(f)(4) and be applied by courts in the same way—namely, that a defendant is ineligible for the adjustment if the defendant meets either of the disqualifying conditions in the provision." Ex. I, Proposed Amendments to the Sentencing Guidelines, at 89 (U.S. Sent'g Comm'n 2023). In the amendment, the Commission proposes splitting §4C1.1(a)(10) into two separate provisions to remove any confusion regarding its interpretation. Accordingly, under no circumstance is Defendant entitled to this reduction.

## **CONCLUSION**

For the reasons set forth above, the United States respectfully recommends that the Court sentence defendant to a Guidelines range term of imprisonment based on a total offense level of 30.

Respectfully submitted,

GLENN S. LEON, Chief
U.S. Department of Justice
Criminal Division, Fraud Section


*/s/ Andrew Jaco*
ANDREW JACO, Trial Attorney
Fla. Special Bar. ID: A5503040
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, D.C. 20005
Phone:   (202) 740-0953
Email:   andrew.j.jaco@usdoj.gov

Scott Armstrong, Assistant Chief
Fla. Special Bar ID. A5502972
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington D.C. 20005
Phone:   (202) 355-5704
Email:   scott.armstrong@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 22, 2024, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

                                                            s/Andrew Jaco
                                                            J. Andrew Jaco
                                                            Trial Attorney